FILED
SEP 20 2019
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH ) <br> OF THE PROPERTY LOCATED AT 314 ) <br> OAKLAND STREET, MORE FULLY ) <br> DESCRIBED IN ATTACHMENT A, ) | No. 3:19-MJ-2130 <br><br><br> **TO BE FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Brandon Stryker, a Task Force Officer ("TFO") with the Federal Bureau of Investigation ("FBI"), and being duly sworn, depose and state as follows:

1. This Application and Affiadvit sets forth facts and evidence demonstrating that there is probable cause to believe that evidence, fruits and instrumentalities of the commission of crimes, specifically violations of federal controlled substance laws including but not limited to Title 21, United States Code, Sections 846 and 841(a)(1), Conspiracy To Distribute Controlled Substances, and Possession With Intent To Distribute Controlled Substances, will be found at the targeted location listed below.

2. I am submitting this affidavit in support of a search warrant authorizing a search of the residence located at 314 Oakland St., Knoxville, Tennessee 37914, (the "TARGET RESIDENCE"), which is more particularly described in Attachment A, for the items specified in Attachment B.

<u>Training and Experience</u>

3. I am a Task Force Officer with the Federal Bureau of Investigation (FBI). As such, I am an "investigative or law enforcement officer" of the United States within the meaning

1

of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516(1).

4. I graduated from the Knoxville Police Department Basic Recruit Academy in 2006. I have served as a Patrol Officer for over 3 years and as a Narcotics Investigator for over 8 years. My most recent position is as a High Intensity Drug Trafficking Area (HIDTA) Task Force Officer with the Federal Bureau of Investigation. This position is primarily tasked with disrupting and/or dismantling drug trafficking organizations. I have received specialized training in drug enforcement from the Knoxville Police Department Training Academy, the Multi-Jurisdictional Counter-Drug Task Force, the Institute of Police Technology and Management, the Drug Enforcement Administration, the Tennessee Gang Investigator's Association, the National Gang Crime Research Center, the Regional Organized Crime Information Center, and the Tennessee Bureau of Investigation. I also attended a week-long certification course in the conduct of wiretap investigations, presented and approved by the Tennessee Bureau of Investigation, in January of 2019. These courses have allowed me to keep abreast of drug enforcement efforts, case development, procedures and practices, general investigative measures and other standardized methods of investigation involving drug offenses. I developed knowledge of the equipment, tactics and techniques used in the production, consumption, sale, and distribution of various narcotics. I was qualified as an expert in narcotics investigations, and testified as such in the Sixth Judicial Circuit Criminal Court in Knoxville, Knox County, TN. In the performance of my duties as a uniformed law enforcement officer and a narcotics investigator, I conducted and participated in numerous investigations involving narcotics and other general investigations of state and federal laws. I was involved in the detection and investigation of state and federal drug violations, including the sale, distribution, importation,

possession, and conspiracy to possess or sell and distribute various narcotics, controlled substances, and drug paraphernalia. I have utilized and managed numerous confidential sources (CS) during various narcotics investigations. Furthermore, I have conducted or participated in numerous narcotics investigations at the federal, state, and local levels during my career. I have been involved with multiple multi-jurisdictional, multi-agency investigations involving the Office of the U.S. Attorney General, Drug Enforcement Administration, Federal Bureau of Investigation, the Bureau of Alcohol, Tobacco, and Firearms, and numerous other state and local law enforcement agencies. I have also participated in multiple investigations where communications intercepts were used as an investigative tool and as a result I am familiar with the procedures involved and their effectiveness as an investigative strategy.

5. Based upon my training and experience with narcotics trafficking, money laundering, and criminal investigations, combined with the knowledge and information provided by other law enforcement officers, I know that:

    a. Drug dealers usually keep controlled substances and paraphernalia for packaging, cutting, weighing, transporting, and distributing controlled substances at places under their control, such as their residences, or in the control of their trusted associates. Drug paraphernalia is typically in close proximity to the locations of the controlled substances themselves.

    b. Persons involved in drug distribution and its related money laundering activities acquire and maintain records related to drug distribution and records relating to the acquisition and disposition of drug proceeds. Drug traffickers commonly create and maintain books, records, receipts, notes, ledgers, and documents reflecting the names, nicknames, addresses, telephone and pager and

3

other contact numbers of their drug trafficking conspirators, including their sources of supply and their customers. These records typically document the following:

    i. amounts of money owed and amounts of drugs purchased by customers, as well as amounts of money owed to and amounts of drugs purchased from sources of supply;

    ii. transportation to acquire and to sell drugs;

    iii. the purchase of drugs, drug packaging supplies, drug paraphernalia, and other assets used to facilitate the acquisition and sale of drugs; and

    iv. the location of storage facilities and other stash locations to store drugs.

c.     Drug traffickers commonly profit and amass proceeds from their illicit activity. In order to protect their illegal activity and be able to utilize the profits, they attempt to disguise and legitimize these profits through money laundering activities.

d.     Drug traffickers often purchase and/or title assets bought with illegal proceeds in fictitious names, aliases, names of relatives, associates, or business entities, who serve as "nominee" title holders while the criminals actually own and continue to use the assets and exercise dominion and control over the assets.

e.     Drug traffickers often engage in legitimate businesses as a "front" to launder drug proceeds. The business front provides a means for the criminal to show that he/she has legitimate income, when, in fact, the income is solely from the criminal activity. Records of such legitimate businesses funded by the

4

proceeds of illegal activity constitute relevant evidence of money laundering offenses.

    f.    Drug traffickers maintain records pertaining to their acquisition, conversion, movement, secreting, transfer, concealment and/or expenditure of drug proceeds, such as: currency, financial instruments and investments, real estate, automobiles, boats, other vehicles, other assets in the form of books, records, invoices, receipts, records of real estate transactions, purchase agreements, automobile titles, bank statements, financial statements, letters of credit, money orders, cashier's checks, safe deposit box agreements and keys, and money wrappers.

    g.    Drug traffickers and their associates are known to use aliases, fictitious and multiple addresses, and multiple drivers' licenses, as well as maintain records of the same, in order to conceal their true identity and hinder law enforcement investigation of their illegal activity.

    h.    Drug traffickers often obtain lines of credit, loans, or mortgages to purchase assets in which they have low equity interest to avoid seizure and forfeiture attempts by law enforcement authorities.

    i.    Drug traffickers primarily utilize U.S. currency as the method of conducting their illegal activity. Therefore, drug traffickers often maintain on hand and have quick access to large amounts of U.S. currency or other liquid assets in order to maintain and finance their ongoing criminal business.

    j.    Drug traffickers often utilize electronic equipment such as computers, smartphones, tablet computers, currency counting machines, and telephone

answering machines to generate, transfer, count, record, and/or store the information described in the preceding paragraphs.

k.  Drug traffickers often use telephones to facilitate their drug activities. Records of such telephone calls, including telephone bills, are commonly kept and maintained by the drug traffickers.

l.  Drug traffickers often take or cause to be taken photographs or video movies of themselves, their associates, their property and assets, and their product.

m.  Drug traffickers commonly maintain firearms, such as handguns, pistols, revolvers, rifles, shotguns, machine guns, and other weapons. These weapons are used to protect and secure their property, drugs, and cash stores from thieves, as drug traffickers are often the victims of robberies and "rip-offs" during a drug or other illegal transaction. Because firearms are in demand by drug dealers, such items are often bartered for drugs or other contraband. Indeed, the law has long recognized that the presence of firearms is relevant and probative of drug crimes, as such are tools of the trade of drug traffickers.

n.  Drug traffickers are not unlike other individuals in that they maintain historical documents and records such as those documents, records, and other items described above. These documents and records will normally be retained for long periods of time regardless of whether their value to the individual has diminished. These documents, records, and other items described above are often maintained in the places within the criminals' dominion and control, such as their residences, garages, other outbuildings and appurtenances associated with such

residences, and curtilage associated with such residences; automobiles, boats, trailers and other vehicles.

### Applicable Case Law

6. The United States Court of Appeals for the Sixth Circuit has held that evidence of drug sales, such as books, records, letters of credit, and electronic media, are likely to be found where drug traffickers live. *United States v. Mendizabel*, 214 Fed. Appx. 496, 499-500 (6th Cir. December 20, 2006)(citing *United States v. Jones*, 159 F.3d 969, 975 (6th Cir. 1998)). *See also United States v. Merrell*, 330 Fed. Appx. 556, 562 (6th Cir. 2009); *United States v. Anderson*, 333 Fed. Appx. 17, 22-23 (6th Cir. 2009); *United States v. Gunter,* 555 F.3d 274, 481 (6th Cir. 2009). In *United States v. Goward*, 188 Fed. Appx. 355 (6th Cir. 2006), the court held that a search warrant affidavit containing credible, verified allegations of drug trafficking, verification that defendant lived at the residence, combined with the affiant-officer's experience that drug dealers keep evidence of dealing at their residence, even in the absence of any indication of any wrongdoing occurring at that residence, established probable cause for the issuance of a warrant to search defendant's residence. The court stated that "[w]e are inclined to…side with our sister Circuits in believing that it is a reasonable inference that 'in the case of drug dealers, evidence is likely to be found where the dealers reside.'" *Id.* at 359 (citing *United States v. Frazier,* 423 F.ed 562, 537 (6th Cir. 2005); and *United States v. Miggins*, 302 F.3d 384, 394 (6th Cir. 2002) (citing cases from the First, Second, Fourth, Seventh, Eighth, Ninth, and D.C. Circuits supporting the proposition that evidence of drug trafficking is likely to be found in the residence of the drug dealer).

### Investigation Summary

7

7. In or around May of 2018, FBI Knoxville and the Knoxville Police Department (KPD) initiated an investigation into the criminal activities of the Almighty Vice Lord Nation, specifically the Knoxville "set" called the Unknown Vice Lords, also known as "Ghost Mob" (hereafter referred to as UGVL). These criminal activities include drug trafficking. Through lawful intercepts of wire and electronic communications, conversations with reliable confidential sources, lawful searches of cellphones used by members of the drug trafficking organization ("DTO"), surveillance and other law enforcement investigative techniques, law enforcement has learned that Alim Turner ("TURNER") is the suspected leader of the Knoxville UGVL. As detailed below, Ushery Stewart ("USHERY"), Chris Hounschell ("WOOGIE"), and others work with TURNER distribute methamphetamine.

8. On August 4, 2019, a federal Grand Jury sitting in the Eastern District of Tennessee, returned a sealed indictment against TURNER, USHERY, WOOGIE, and others, for conspiracy to distribute and to possess with intent to distribute controlled substances, including methamphetamine, a controlled substance, in violation of 21 U.S.C. 841 (a) (1) and 846.

9. On June 5, 2019, Chief United States District Court Judge Pamela Reeves, of the Eastern District of Tennessee, authorized the wire and electronic interception of TARGET TELEPHONE 2 ("TT2") bearing the number 423-295-5574, believed to be used by TURNER. Interception began on June 6, 2019, and continued through July 5, 2019. As noted below, the interception of TT2 demonstrated that TURNER, among others, was purchasing and then reselling illegal narcotics with USHERY, and others.

10. On July 26, 2019, Chief United States District Court Judge Pamela Reeves, of the Eastern District of Tennessee, authorized the renewed interception of wire and electronic communications over TT2 and the initial interception of wire communications of TARGET

8

TELEPHONE 3 ("TT3"), a pre-paid cellular telephone bearing the number 865-405-8465, subscribed to by "Alim Turner" and believed to be utilized by TURNER, USHERY, and others.

11. On 06/25/2019, at 12:57 p.m., a call was intercepted over TT2, used by TURNER, during which USHERY states, "Yeah, but I'm trying to get some bread today though." TURNER responded, "Me too. You gonna help me get these blues off?" USHERY then stated, "Yeah, I'm finna go into trap mode. You finna see, everybo, everybody else done see me go into trap mode but you, P." TURNER responded, "Yeah, I'm trying to go in there with you, boy." Based on my training and experience, as well as the context within the investigation, I believe that in the conversation, USHERY told TURNER he is trying to get some bread, meaning money. TURNER says he is trying to get these blues off which is a reference for oxycodone prescription pills that are blue in color. STEWART stated he was going to go into "trap mode." "Trap mode" is a slang term for selling and distributing illegal narcotics.

12. On 06/25/2019, at 1:06 p.m., a call was intercepted over TT2, used by TURNER, during which TURNER and USHERY have a conversation. TURNER states, "Alright, and I got, and I got, um, a play for two of 'em. What you going to charge for one?" USHERY responds, "For what?" TURNER stated, "Some of that ice cream." USHERY responded, "Oh. Shit, like three." TURNER stated, "Damn, 275." USHERY responded, "Alright, alright. That's a deal. What's the, what's, what's that?" Based on my training and experience, as well as the context within the investigation, I believe that in the conversation TURNER stated he could sell two ounces of meth ("ice cream") to a customer. USHERY asked what TURNER wanted and TURNER stated, "ice cream," or meth. USHERY states he is going to charge TURNER "three," meaning $300. TURNER then asked for a lower price of $275, and USHERY agreed.

9

13. In July of 2019, law enforcement intercepted conversations over TT2 and TT3 in which TURNER and USHERY discussed plans to have pounds of meth shipped to addresses in the Eastern District of Tennessee. On July 13, 2019 law enforcement intercepted and later searched, pursuant to a search warrant, a package shipped to "Joe Stewart," at a local address. Postal records indicated that no such person, with USHERY's last name, lived at the address. Inside the package, law enforcement found approximately 5 pounds of meth. TT3, subscribed to by TURNER, and used by TURNER, called the United States Postal Service package tracking system in order to track the package that contained approximately 5 pounds of meth.

14. On 08/01/2019. At 1:54 p.m., a call was intercepted over TT3, now being utilized by Kedaris Traysean Gilmore after TURNER was arrested by state authorities. Gilmore had a conversation with USHERY where Gilmore stated, "I said where you at?" USHERY responded, "Out the way trying to get this bag off." Gilmore stated, "Uh, um. So it's Thursday and bruh talked, call me (UI)." USHERY responded, "Who?" Gilmore stated, "The plug." USHERY responded, "They said what?" Gilmore stated, "They are going try to have it some, sometime by today or some shit." USHERY responded, "I thought you said Friday." Gilmore stated, "No, he said today. But I told them, said we, that uh, I just got to saying shit I ain't got in sight of it. He was like, well call me when you get in sight of it." USHERY responded, "You said what?" Gilmore stated, "He told me to call him when I got uh, when I got the money." USHERY asked, "What are we at right now?" Gilmore, talking to someone in the background, stated, "Trey, how much is in that safe? How much did he say was in the safe? Eleven thousand. How much? Eleven thousand." USHERY responded, "And we gotta pay him sixteen?" Gilmore stated, "I, I think." USHERY responded, "So that leaves five thousand." Gilmore agreed. USHERY stated, "Alright. I've already made…Did you get that money from Cobie?" Gilmore responded, "No."

10

USHERY stated, "Get that. Fool, that's forty-eight hundred. That's forty-eight hundred right there. That's the bread right there." Based on my training and experience, as well as the context within the investigation, I believe that in the above conversation, Gilmore and USHERY are planning to purchase crystal methamphetamine from their "Plug," or source of supply, located in Nashville, Tennessee

15. One the same day at 2:36 p.m., Gilmore, utilizing TT3, called USHERY back and told USHERY, "All BP owe him is fourteen one thirty. USHERY responded, "Oh, alright." Gilmore stated, "But look, we got, we got, we got what we got and then what you said you should have will be exactly." USHERY responded, "We should have that by the end of the tonight." Gilmore stated, "Right. So, I told him, I told him what we, what we had and shit he was like all he owe him is fourteen one thirty. He said, so he said by the end of tonight or in the morning whenever we get it, or whenever we got the full amount, call us." USHERY responded, "We need to be headed towards Nashville." On 08/02/2019, Gilmore and USHERY communicated several times coordinating a meet at the TA Travel Center, 615 N Watt Rd., Lenoir City, Tennessee. Surveillance units observed USHERY deliver a bag of dog food to Gilmore at the TA Travel Center, then Gilmore, along with Jyshon Forbes, traveled west on Interstate 40 towards Nashville. A Tennessee Highway Patrol marked unit conducted a traffic stop of Forbes and Gilmore's vehicle where they located $13,130 concealed inside a bag of dog food. Based on my training and experience, as well as the context in this investigation, I believe that the $13,130 was headed to Nashville as payment for the meth that was being shipped to TURNER, USHERY, and others in the DTO here in the Eastern District of Tennessee.

## WOOGIE is a Drug Trafficker

16. On 08/01/2019, at 9:18 p.m., a call was intercepted over TT3, utilized by Kadaris Traysean Gilmore, during which Gilmore placed a call to WOOGIE. Gilmore stated, "Alright, nah. I was about to, uh, pull up on you. I got, uh, that lil seven of the other shit I was tryin' to see if you gonna buy it or see if somebody need it or something so I could get the little bread." WOOGIE responded, "What, the food?" Gilmore stated, "Nah, the other shit." WOOGIE asked, "Clear?" Gilmore responded, "Yeah, I got like seven of that shit." WOOGIE then stated, "You know where Towns lives?" Gilmore responded, Yeah." WOOGIE stated, "He don't live there no more. Pull over there and let her know Woogie told you to come by." Gilmore then stated, "I really got a little more than that, but I was, uh, somebody was supposed to gonna come and get it, but they been playin' all damn day. Like all together, all together I probably got like a half of that shit. Maybe a Z. I don't know. I'll show you when I see you." Based on my training and experience, as well as the context in this investigation, I believe that during the conversation, Kedaris Traysean Gilmore placed a call to WOOGIE, and asked if WOOGIE would purchase crystal methamphetamine from him or "clear." Gilmore refers to "seven," meaning seven grams, then tells WOOGIE that he has more than that, maybe a half, referring to half an ounce, or a "Z", referring to a "Zip," which is slang for one ounce. WOOGIE then made plans with Gilmore to meet to see the crystal meth.

17. On or about August 2, 2019 during a conversation between USHERY and Gilmore about the price of meth, WOOGIE got on the phone and offered to purchase several ounces of meth if that would help get the amount of money up to what USHERY and Gilmore needed to pay their source of supply. As noted above, hours later, Gilmore was stopped carrying $13,130 in cash in dogfood bag headed west towards Nashville.

12

18. In late August of 2019, a confidential source of information, a person that was intercepted speaking with TURNER and USHERY over the wire about buying meth, was then interviewed by law enforcement. That person told law enforcement that he has purchased several ounces of meth from WOOGIE in the past few months.

### WOOGIE Lives at the TARGET RESIDENCE

19. WOOGIE's Driver's license lists his address as the TARGET RESIDENCE. Recently, a former prison employee, called a current correctional officer offering cash to deliver narcotics to prisoners inside the prison. Law enforcement learned about the offer and approached the former prison employee. The former prison employee told law enforcement that she was offered $1,000 to help smuggle narcotics into the prison. She was instructed to meet someone at the TARGET RESIDENCE to receive the drugs and then was supposed to deliver the drugs to a current correctional officer at the prison to smuggle them in. On August 31, 2019, when then former prison employee arrived at the TARGET RESIDENCE, the former prison employee identified WOOGIE as the person left the house and handed her a package containing drugs. A copy of the text messages to the former employee was viewed by law enforcement. The text messages to the former employee instructed her to travel to the TARGET RESIDENCE and gave WOOGIE's telephone number as a contact.

## CONCLUSION

20. Based on the forgoing, I request that the Court issue the proposed search warrant.

Respectfully submitted,

*Brandon J. Stryker*
Brandon Stryker
TFO, FBI

Subscribed and sworn to before me on September 4, 2019.

*Bruce Guyton*
H. BRUCE GUYTON
UNITED STATES MAGISTRATE JUDGE

14

# ATTACHMENT A
## Property to Be Searched

This warrant applies to the house located 314 Oakland St., Knoxville, Tennessee 37914. This property is described as follows:

<u>Description:</u> A single family residence with blue vinyl siding, black shutters and a weathered grey shingled roof. A door is located in the middle of the residence that is wood color and is covered by a small roof overhang supported by white metal posts.

(See below photo)



1

# ATTACHMENT B

## Particular Things to be Seized

Packaging material, scales, and items used to weigh, package, measure, and distribute meth; drug paraphernalia; drug records, drug ledgers, account books, notes, names or code names and nicknames, or identifying information reflecting customers, amounts of drugs bought and sold, and amounts of money paid, owed or collected; United States Currency reflecting proceeds of drug sales or monies set aside for the purchase of drugs; financial instruments; safes, lock boxes, lockable money bags, and other containers which can be used to secure and conceal drugs, currency, firearms, proceeds of drug transactions, or records of drug transactions; telephone and address books, notes, cellular telephones, personal computers with hard discs of portable memory devices containing telephone and addresses of co-conspirators or other such records, photographs, or videotapes indicating a criminal association between co-conspirators; records reflecting the identities, addresses, and telephone numbers of customers who use, transport, or distribute meth; safety deposit box keys; financial records relating to sales of meth or the laundering of proceeds from the sale of methamphetamine, and other containers used to store or secrete currency or records described herein; Firearms, ammunition or other weapons used to protect drugs or proceeds of illegal drug sales, or purchased with proceeds from illegal drug sales; Records pertaining to bank accounts, savings accounts, brokerage accounts, any and all stored value cards, and all financial records relating to the concealing of proceeds of the receipt, investment or disbursement of proceeds, including records of domestic and foreign money transactions or records of the transfer of funds within or into and out of the United States; Papers, passports visas or other travel documents, identification cards of papers, driver's

1

licenses, tickets, notes, receipts, and other items relating to travel expenditures; computers, electronic storage devices, physical keys, encryption devices, dongles, and similar physical items necessary to gain access to computer equipment, electronic storage devices, or data; and any and all items used in the furtherance of distribution of and possession with the intent to distribute methamphetamine, in violation of 21 U.S.C. § 841; and conspiracy to distribute and possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 841 and 846.